Filed 6/17/14  P. v. Sandoval CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE MANUEL SANDOVAL,<br><br>    Defendant and Appellant. | B251835<br><br>(Los Angeles County<br>Super. Ct. No. TA128695) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

Dale E. Manolakas, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Jose Manuel Sandoval, appeals from the judgment entered following a jury trial which resulted in his conviction of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).[1]  The trial court sentenced Sandoval to the mid-term of three years in state prison.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

    a. *The prosecution's case.*

In June 2013, Maria P. and her two children, 14-year-old A.A. and 4-year-old Felipe S., lived in space No. 12 of a trailer park on Oak Street in Compton.  Maria and Sandoval had purchased the trailer together and had lived there as boyfriend and girlfriend from March 2012 to December 2012.  Sandoval and Maria had been involved in a relationship for approximately six years and Sandoval was the father of Maria's son, Felipe S.  However, in December 2012, the two broke up and Sandoval moved out of the trailer.  Maria had not seen Sandoval since he had moved out and had not expected to see him "any time in the future."  She believed he had left the country and, as far as she was concerned, he no longer had permission to enter the trailer.  Maria had changed the locks on the trailer and, since Sandoval had left, had paid the rent for the space in the mobile home park and had renegotiated the loan on the mobile home so she could make the payments.

After Sandoval left, Maria had begun dating a man named Pedro Galvez.  Galvez also had a trailer at the park and Maria had babysat his three children.  After they started dating, Galvez and his children spent much of their time at Maria's trailer.

On the evening of June 15, 2013, Maria took medication to help her sleep, then went to bed at approximately 8:00 p.m.  Galvez, who was at work at his job in Carson until approximately 1:30 a.m. on June 16, stopped on his way home and had a 16-ounce beer, then went to Maria's trailer and got into bed with her.  All of the children, with the exception of Galvez's 12-year-old son, were at Maria's trailer that night.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

In the early morning hours of June 16, 2013, Maria and Galvez were awakened by Sandoval. He had most likely entered the trailer through a broken window and had then gone into the bedroom. There, he leaned over Galvez, took Maria by the hand and began to speak to her, calling her by her nickname, " 'Flaquita,' " which means "skinny." Maria opened her eyes and, when she saw it was Sandoval, closed them again "out of fear."

Galvez, who had never seen Sandoval before but recognized him from photographs, realized Sandoval was trying to wake Maria. Sandoval had turned on the light and, as Galvez was attempting to pull his arm from under Maria's head so he could stand up, Sandoval left the room. Galvez was afraid Sandoval was going to return to the bedroom and attempt to hurt him.

When Sandoval stepped back into the bedroom, he was holding a knife in his right hand. Galvez stepped back and ended up back on the bed. Sandoval grabbed Galvez by the throat and held the knife up against his neck. After pulling Galvez's arm back, Sandoval then placed the knife in the middle of Galvez's abdomen. Sandoval whispered to Galvez " 'I'll kill you,' " "drew the knife across [Galvez's] throat," then told Galvez he wanted him to leave.

By that time, two of the children had come into the bedroom and had walked over to Maria. One of Galvez's daughters stood right next to Maria and Maria's son had gotten into the bed with her. After covering herself and the children with a blanket, Maria opened her eyes again and saw "[t]hat [Sandoval] had [Galvez] by the neck." Maria decided to stay in the bed because she was dizzy from her medications and "because of what was going on."

Galvez, who believed Maria was still asleep, looked over, saw his daughter and, after she told Sandoval, " 'Don't kill him,' " decided to leave. Galvez told Sandoval, " 'I'll get out of here. I'll leave. I'll leave.' " Galvez gathered his two children and, while Sandoval was still in front of him holding the knife against his abdomen, backed his way down the hallway toward the door. After they got outside, Sandoval, who was still holding the knife, told Galvez to jump over the locked gate. Galvez, however,

3

refused because he was afraid Sandoval would stab him in the back as he was making his way over the fence. Sandoval then instructed Maria's daughter, A.A., who was standing in the yard, to get the keys so he could open the gate. A.A. got the keys, Sandoval unlocked the gate and Galvez, accompanied by his two children, stepped out. After he had instructed his children to move some distance away, Galvez decided to "g[e]t tough." He told Sandoval to " 'put the knife down and fight like a man.' " Instead, Sandoval simply turned around and went back inside the trailer.[2]

A.A. stayed outside when Sandoval went back into the trailer and Galvez, who realized he had left his cell phone inside, asked her to get it for him. She did so and Galvez ran to the front of the parking area by the trailers to call 911. However, before he had made the call, deputy sheriffs arrived. One deputy had Galvez sit in the back of his vehicle and wait there for several minutes.

That night deputy sheriffs spoke to Maria. She told them about her prior relationship with Sandoval, then showed them a "restraining order" she had obtained against him. Although Maria had never spoken to Sandoval about the restraining order, she had informed his brother she had applied for and received it. When deputy sheriffs asked Maria about the incident which had occurred between Sandoval and Galvez, she told the deputies she "couldn't tell them anything about [it] because [she had been] too heavily affected by the [sleeping] pills[.]" The only thing she was able to tell the deputies was that she had opened her eyes, had seen "that [Sandoval] had [Galvez] by the neck," then had closed her eyes again.

A.A. first met Sandoval when she was seven years old. He was involved with her mother, Maria, and lived with Maria, A.A. and A.A.'s younger brother until Maria and Sandoval ended their relationship in December 2012. A.A. next saw Sandoval on June 5, 2013 at her graduation from the eighth grade. A.A. was "shocked" when she saw Sandoval, who had not been invited to the event. Sandoval approached A.A. when she

---

[2] In both 2008 and 2009, Galvez had suffered convictions involving "domestic violence" against his ex-wife. However, Galvez's wife had apparently also been violent and when they divorced, he received full custody of their children.

was with some friends and her mother, Maria, was in the restroom. Sandoval asked A.A. if he could have his picture taken with her and, after a friend obliged, A.A. tried to "get[] away from [Sandoval as fast as possible] so [her mother] wouldn't see him." A.A. did not want her mother to get sick from "[h]er pressure." A.A. went to the front of the school, met her mother and insisted they go home. A.A. did not see Sandoval for the rest of the day.

A.A. next saw Sandoval on June 15, 2013. A.A., Maria and Felipe S. were at home in the trailer when Sandoval came by to get "his stuff," including a pair of boots and a camera. He and Maria spoke for about 10 minutes and throughout the conversation Maria continuously asked Sandoval to leave. When Sandoval refused, indicating that " 'this [was his] trailer,' " Maria, A.A. and Felipe S. left the trailer and went to a nearby park. When A.A., Maria and Felipe S. returned to the trailer approximately three hours later, Sandoval was gone.

During the early morning hours of June 16, 2013, A.A. came home to the trailer after attending a party and fell asleep on the couch. She was awakened when she heard Sandoval's "screams." Sandoval was yelling at Galvez, telling Galvez to get out of the house. Sandoval then came out of the bedroom, hit the bar in the kitchen, then dropped something onto the floor. After he retrieved the object, Sandoval returned to the bedroom, followed by A.A. When she opened the door, A.A. saw Sandoval "holding [Galvez] from the neck, and with his other hand, . . . holding a knife." Sandoval then pointed the knife at Galvez's upper abdomen and Galvez told Sandoval to "stop it" because "his kids were there." At that point, A.A. left the trailer, went into the backyard and called 911. A.A. told the 911 operator Sandoval had a knife and was "trying to . . . hit this other guy."

When A.A. then walked to the front yard, she saw Galvez standing outside the gate. Sandoval was standing just inside the gate, shouting at Galvez, repeatedly telling him to leave. Galvez saw A.A. and asked her to go into the trailer and get his keys and his phone. A.A. did so, gave them to Galvez then told him to leave because she did not "want to make [the situation] worse." A.A. then followed Sandoval back into the trailer

5

and when he tried to wake Maria, A.A. told him to leave and to "leave [them] alone." Sandoval started to walk out of the trailer and A.A. asked him where he had left the knife. Sandoval retrieved a knife and walked out the front door, only to be met by a deputy sheriff shining a light on him.

Sandoval tossed two knives to the ground, then attempted to jump over the fence at the side of the yard. When he was unable to make it over the fence, Sandoval walked back toward the front of the trailer where he was detained and handcuffed by a sheriff's deputy. Other deputies retrieved the knives. As the deputies were approaching him, Sandoval looked at A.A. and told her to " 'tell them that [he] didn't do anything, that it wasn't [him].' " A.A. refused and Sandoval shook his head, then looked at A.A. and said a number of times, " 'When I come out.' " A.A. thought that, in making the remark, Sandoval was telling her "that when he was going to come out, maybe [he was] going to look for [them] and do something even worse." In making the remark to A.A., Sandoval made her feel "threatened [and] scared."

b. *Defense evidence*.

Maria and Sandoval were "together" for seven years and had a child, their son, Felipe. Maria and Sandoval had purchased a mobile home together, which Sandoval had moved out of in December 2012. After that time, Sandoval made no payments toward the mobile home because he had been deported to Mexico. He had, however, always kept in touch with Maria. He either spoke to her on the telephone or communicated with her by text message. Sandoval still had on his cell phone several text messages from Maria, one of which was dated January 6, 2013 and one of which was dated May 1, 2011.

Sandoval returned to this country on June 5, 2012. He had promised A.A. he would be back for her graduation and he had informed Maria he was coming. Sandoval saw Maria at the graduation, hugged her and kissed her. He then moved back into the mobile home with Maria, Felipe and A.A. At that time Galvez, who Maria had told Sandoval was "living there as a renter," was also living at the trailer. Sandoval, Maria and their two children slept in the bedroom. Sandoval slept in the bed with Maria. Galvez and his children slept in the living room.

6

On Friday, June 14, 2013, Sandoval came home from work early because he was not feeling well. When he found Galvez at the trailer, Sandoval asked Maria why Galvez was still there. Sandoval had thought Maria was going to "kick[] him out."

The following morning, Saturday, Maria and Sandoval had an argument and Maria "threw [Sandoval] out. She told [him he] couldn't be there any more because she had a restraining order." Sandoval indicated he had known about the restraining order, but that Maria had let him stay with her for over a week in spite of it.

On Saturday evening, Sandoval went out and had a few beers. At approximately 4:00 o'clock on Sunday morning, June 16, he went to the mobile home and, although he no longer had keys, entered the trailer through a window. Sandoval went to the mobile home "to see if [Maria] was cheating on [him]." Sandoval did not have a weapon when he entered the trailer. He first went to the bedroom, turned on the light and saw Maria in bed with Galvez. He then saw his son sleeping on the floor and became angry. Sandoval went to the kitchen and "got the knife . . . to [make Galvez] leave the house."

When Sandoval returned to the bedroom, Galvez got up and, as Galvez approached Sandoval, Sandoval "pushed him [on the chest] with [his] left hand." Sandoval did not grab Galvez by the neck or point the knife at him. When Galvez "came at [him]," Sandoval simply told him, " 'Don't try. I don't want to hurt you and I don't want to get hurt either. Get your kids and go[.]' "

Galvez gathered up his children and walked with them until they were outside the fence surrounding the mobile home. Galvez then told Sandoval to " 'throw the knife down.' " Sandoval threw the knife to the ground and "wait[ed] for [Galvez] . . . to come at [him]." When Galvez did not do so, Sandoval turned around and walked back into the trailer "to talk to [Maria] to ask her why [she had] done that to [him]" and to tell her "that [he] loved her." However, when Sandoval went back inside the trailer, Maria told him to leave and that the police had been called. When Sandoval went out to the front yard to find the knife he had dropped, police officers arrived. Before he was taken into custody, Sandoval turned to A.A. and told her that he "loved her a lot and that [he] was very sorry

7

for what happened." He never tried to keep A.A. from being a witness or speaking with the police. He did not mutter, " 'When I get out[.]' "

Sandoval first saw Galvez at A.A's graduation. Then, two days later, Sandoval saw Galvez "caressing [Maria's] hair." The following day, Galvez told Sandoval that he and Maria were " 'together' " and if Sandoval " 'touch[ed] her again, [he was] going to be sorry.' " When Sandoval asked Maria what was going on, she told Sandoval that " 'nothing' " was happening between her and Galvez and that Galvez was " 'drunk' " and " 'on drugs.' "

The following Saturday, June 15, 2013, Maria took away Sandoval's keys and "kicked [him] out" of the trailer.

Sandoval had been arrested on December 17, 2012 for pushing Maria onto the floor at a restaurant, then placing his hands around her neck. Although police officers had indicated Sandoval had apologized for the incident, Sandoval testified he did not apologize because he "didn't feel guilty" for having pushed and grabbed Maria. Sandoval explained he believed Maria had been cheating on him and he had pushed her and placed his hands around her neck "in a moment of anger without thinking about it" and when he had tried to pick her up, Maria had told him to " 'get going.' "

### c. *Rebuttal*.

During the early morning hours of June 16, 2013, Galvez was awakened by Sandoval, who was leaning over Galvez's bed. Galvez was "shocked" to see Sandoval, but he did not touch Sandoval. Even when Sandoval came into the bedroom for the second time, carrying a knife, Galvez did not attack him.

Prior to that morning, Galvez had not seen Sandoval in person. Galvez had never lived with Sandoval in Maria's trailer.

### 2. *Procedural history*.

Following a preliminary hearing, on August 1, 2013 Sandoval was charged by information with one count of assault with a deadly weapon, a felony (§ 245, subd. (a)(1)) (count 1), one count of first degree burglary, person present, a felony (§ 459) (count 2) and one count of dissuading a witness from reporting a crime, a felony

8

(§ 136.1, subd. (b)(1)) (count 3). Sandoval entered pleas of not guilty to each of the charges and denied any and all special allegations.

Sandoval requested a jury trial and jury selection began on September 30, 2013. The presentation of evidence began on October 1, 2013. After all of the testimony had been given, defense counsel indicated Sandoval's cellular telephone should be admitted as an exhibit. Following argument by the parties, the trial court denied the motion, stating the phone contained "numerous text messages that [were] hearsay and [did] not necessarily apply" to this case. The court continued: "[Although the phone] did show . . . something on the screen concerning a text message [received by Maria], . . . that [evidence] ha[d] already been seen by the jurors and admitted. [The court was] not going to admit the entire cell phone."

On the afternoon of October 3, 2013, after being instructed by the trial court and hearing counsel's arguments, the jury started its deliberations. On October 4, 2013, the jury submitted the following question to the trial court: "Can we please have the court[']s definition of 'possessory?' " In response, the trial court wrote: "Possessory describes a[c]cess." Later on October 4, the jurors submitted to the trial court the following inquiry: "In the burglary charge, is the defendant[']s second entrance into the bedroom considered a separate and distinct event? Should we consider it a potentially second attempt at burglary?" The trial court responded, "Both questions are questions of fact for the jury to decide based on the law as instructed." Still later on October 4, the jurors sent to the trial court a note stating: "How do we indicate there is a hung jury on any particular charge?" The trial court wrote back to the jurors, "If you have verdicts fill out the verdict forms and send out a note that you have verdicts on some counts and are unable to reach verdicts on some counts."

On October 4, 2013, the jury found Sandoval "GUILTY of the crime of ASSAULT WITH [A] DEADLY WEAPON, upon PEDRO GALVEZ with a . . . KNIFE, in violation of . . . section 245[, subdivision] (a)(1), a Felony, as charged in Count 1 of the Information." After some discussion, the trial court determined there was no reasonable likelihood the jurors would be able to reach unanimous verdicts on the

9

remaining counts. With regard to count 2, first degree burglary, they were divided, eight believing Sandoval was guilty and four believing he was not guilty. As to count 3, dissuading a witness, two jurors believed Sandoval was guilty and ten believed he was not guilty. Accordingly, the trial court declared a mistrial as to those counts and, on the People's motion, dismissed them.

At sentencing held on October 9, 2013, the trial court imposed the mid-term of three years in state prison for Sandoval's conviction of assault with a deadly weapon. The court then awarded Sandoval presentence custody credit for 116 days actually served and 116 days of good time/work time, or 232 days. Sandoval was then ordered to pay a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction fine (Gov. Code, § 70373), a $280 restitution fine (§ 1202.4, subd. (b)) and a stayed $280 parole revocation restitution fine (§ 1202.45).

Sandoval filed a timely notice of appeal from the judgment on October 9, 2013.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed April 3, 2014, the clerk of this court advised Sandoval to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


CROSKEY, J.


ALDRICH, J.